UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD KELLEY | No. 3:22-CR-118<br><br>Judge Varlan |

### UNITED STATES' RESPONSE TO DEFENDANT'S
### NOTICE OF OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

On April 8, 2025, the United States Probation Office filed a revised presentence investigation report ("PSR") in the above-captioned matter (Doc. 113).[1] Thereafter, on June 6, 2025, the Defendant objected to the PSR. (Doc. 123). The Defendant makes a number of objections, some of which affect his advisory Sentencing Guidelines range.

"[F]or any disputed portion of the presentence report," the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The Court may rely on undisputed facts at sentencing. Fed. R. Crim. P. 32(i)(3)(A). "To create a factual

---

[1] For the sake of clarity, this memorandum refers to documents filed on the Court's electronic record by document number and intra-document page number provided by the Court's electronic case filing system. It refers to the United States' trial exhibits using the abbreviated identifier "GX," followed by the exhibit number as logged in the Court's jury evidence review system and page number assigned by that system, e.g., "GX 2" being the defendant's "list" and "GX 1 at 4" being the fourth page of the "Be Prepared" Signal chat transcript.

For the Court's reference, Doc. 87 in the Court's electronic record contains a list of each trial exhibit, followed by a textual description of that exhibit.

Finally, the memorandum will refer to any exhibits not admitted at trial but tendered for sentencing purposes as "GSX," followed by a numerical identifier.

dispute, a defendant must produce some evidence that calls the reliability or correctness of the alleged facts into question – a burden of production that requires more than a bare denial." *United States v. Cover*, 800 F.3d 275, 278 (6th Cir. 2015) (quotation omitted). The Court resolves disputes under a preponderance-of-the-evidence standard, *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006). In so doing, it is free to make reasonable inferences from facts in the record when fashioning a sentence. *See United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019).

The United States respectfully responds to each of the Defendant's objections in turn. In sum, the United States Probation Office correctly calculated the Defendant's advisory Guidelines range, and the Court should deny those objections that bear on that range.

## ANALYSIS

I. *The Court Need not Address some Background and Biographical Information Objections, It May Elect to Sustain one, and it Should Overrule Others.*

The Defendant objects to several facts that he characterizes as "background/biographical information." A number of these can be addressed in summary fashion.

- The United States does not intend to present evidence concerning the Defendant's assertion that he does not use the alias "Edward Kellie." (Doc. 123 at 1).

- The United States does not intend to present evidence as to the exact chain of communication between Christopher Roddy, Adam Hoffman, Zach Cross, and Ray Barnhardt. (*Id.* at 2; *see* PSR at ¶ 9).

- The United States also does not intend to present evidence as to certain familial, medical, and biographical issues the Defendant raises, i.e.:

    o the Defendant's mother's middle name;

    o the Defendant's father's age;

    o the Defendant's ex-wife's middle name;

2

- o the Defendant's former residence (or asserted lack thereof) in North Carolina;
- o the location of the Defendant's cockroach tattoo;
- o the precise medical imaging procedure performed on the Defendant's spine (i.e., x-ray or MRI) or his attendant pharmaceutical pain management regimen;
- o the Defendant's employment status at the time of his arrest;
- o the Defendant's job title at the Bellevue Gun Club; and
- o the spelling of the word "sergeant."

(Doc. 123 at 2-3; *see* PSR at ¶¶ 69-71, 73, 79-80).

As to these issues, the United States defers to the United States Probation Officer's judgment and response in any PSR Addendum she may file. While the Court may choose to resolve these objections, it need not do so unless it intends to rely on the underlying facts in fashioning the defendant's sentence. *See* Fed. R. Crim. P. 32(i)(3)(B); *United States v. Davis*, 2017 WL 1730903, at *2 (E.D. Tenn. May 2, 2017) (citing Rule 32 for the proposition that the "district court need not rule on an objection that will not affect sentencing").

The Defendant is correct in his assertion that law enforcement never recovered a flamethrower or flare launcher from him. (*See* Doc. 123 at 2; PSR at ¶ 19). While the FBI did not recover those items, law enforcement did find a "to buy" and "to do" list that included "gun stuff" such as Mossberg shotguns, a flame thrower, a can launcher, thermal optics, a child's gas mask, and a flare launcher. (GX 14). A selection of items recovered from the May 2022 search of the Defendant's residence is featured in GX 13. The United States respectfully submits that paragraph 19 of the PSR may be revised accordingly.

The Court should, however, overrule two of the objections the Defendant characterizes as background. First, the trial record established that the Defendant and Austin Carter conducted drills

3

of exactly the type described in the PSR. (*See* Doc. 123 at 2; PSR at ¶¶ 9, 12). Carter testified that he and the Defendant would engage in these drills to train for close-quarter battle or, as he termed it, "CQB." He testified that he and the Defendant trained to ensure maximal effectiveness in the notional war the Defendant intended to initiate against his perceived enemy: the FBI.

Carter specifically identified November 23, 2022, as one instance during which the Defendant conducted such training. At the Defendant's house, he and Carter did "dry fire" drilling and CQB training. This is the same meeting at which Carter and the Defendant discussed the means and methods by which the Defendant intended to reconnoiter and assassinate FBI agents. The term "IA drills" was used by the Defendant himself when discussing the activities he intended to organize at the "place around Athens" he had procured for training. (GX 1 at 15).

Irrespective of nomenclature, the proof at trial established that the Defendant conducted exercises to prepare for his impending attacks on law enforcement. The Defendant's objection to the contrary should be overruled.

Likewise, the Court should overrule the Defendant's objection to the PSR's notation that "[i]t was later discovered [the Defendant] did not gift those firearms." (Doc. 123 at 2; PSR at ¶ 23). The Defendant did not, in fact, gift his firearms to anyone. At most, under court compulsion, he loaned them to a third party. (*See* GX 25R). At trial, the Court heard the Defendant tell Christopher Roddy that he was going to retrieve them in the immediate future so that his arsenal would be at "arms' reach." (GX 11). He even told Roddy to store the weapons for him. Such a temporary transfer of weapons – especially coupled with a manifest intent to retrieve them – does not constitute a "gift." The PSR rightly reflects this fact.

4

*II.     The Child Pornography the Defendant Possessed is Appropriately Recorded in the PSR.*

The Defendant possessed a number of images of child pornography on his computer.[2] He asks the Court to excise that fact from consideration, objects to its inclusion in the PSR, and objects to the PSR's recommendation that he be subject to related conditions. The Court should overrule his objection.

Sentencing courts "may appropriately conduct an inquiry broad in scope, largely unlimited either to the kind of information [they] may consider or the source from which it may come." *Nichols v. United States*, 511 U.S. 738, 747 (1994) (internal quotation omitted); *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) (holding the same). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also* U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."). This wide discretion permits the Court to consider reliable information of prior criminal activities for which the Defendant has not been charged. *See United States v. Rayyan*, 885 F.3d 436, 441 (6th Cir. 2018); *United States v. Overby*, 838 F. App'x 966, 970 (6th Cir. 2021) (quoting *United States v. Hill*, 688 F.2d 18, 20 (6th Cir. 1982), for the proposition that a court may consider prior criminal conduct for which a defendant had "never been arrested, indicted, or convicted").

---

[2] In connection with its forthcoming sentencing memorandum, the United States anticipates filing a report detailing the examination of the Defendant's computer and the child pornography files found thereon. That report, which was provided in discovery to the Defendant, will be designated "GSX 1."

5

The Defendant's possession of child pornography is far from irrelevant; it directly bears on his background and character. The Sixth Circuit has repeatedly emphasized that "[r]eceipt, distribution, and possession of child pornography are extremely dangerous to the community." *United States v. Hoilman*, 2023 WL 4074630, at * 2 (6th Cir. Apr. 24, 2023); *quoting United States v. Foster*, 2020 WL 6791572, at *3 (6th Cir. July 20, 2020) (order holding the same, noting that danger is pronounced "particularly because such activities are often hidden from a defendant's closest friends and family members"). "Each download and view of a child-pornographic image or film exacerbates the harm to the child involved in its production." *Foster*, 2020 WL 6791572, at *3 (internal quotation omitted).

The Defendant's possession of sexual images featuring children is serious, and it informs considerations such as protection of the public, as well as the need for incapacitation and rehabilitation. It is therefore a fact of which the Court should be aware when fashioning the appropriate sentence in this case, and it may be properly taken into account at sentencing as an example of the defendant's conduct, character, and capacity for danger.

The Defendant's primary complaint is that the instant offense of conviction is not a sex offense and, by inference, the release conditions applicable to sex offenders should not apply to him. The United States submits that the opposite is true.

A given condition of supervised release is appropriate if it:

(1) is reasonably related to specified sentencing factors, namely the nature and circumstances of the offense and the history and characteristics of the defendant, and the need to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(2) involves no greater deprivation of liberty than is reasonably necessary to achieve these goals; and

> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission.

*United States v. Widmer*, 785 F.3d 200, 203-04 (6th Cir. 2015) (internal quotation omitted). "Where a condition of supervised release is reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public, it must be upheld." *Id.* (internal quotation and alteration omitted).

Supervised release conditions need not be related to the underlying offense of conviction. *See, e.g.*, *United States v. Childress*, 874 F.3d 523, 527 n.2 (6th Cir. 2017) (affirming psychosexual evaluation as a condition of release for a defendant convicted of being a felon in possession of a firearm). More specifically, "[s]ex-offender treatment is reasonably related to the factors in Section 3553(a), even if the offense of conviction is not a sex offense, so long as the sexual offenses are recent enough in the defendant's history that the goals of rehabilitation and protecting the public justify an order for treatment." *Id.* (quoting *United States v. Evans*, 727 F.3d 730, 735 (7th Cir. 2013)).

In this case, the evidence preponderates toward one conclusion: the Defendant was accessing and downloading sexual images of children for years. The Defendant's present claim that he has no need for the conditions attendant to sex offenders is contradicted by his digital history, and he himself apparently (if implicitly) recognized that his behavior was aberrant and dangerous. On January 27, 2020, the user "Ed" bookmarked a website: "Break free from porn and live a better life." To the extent he undertook any efforts to that end, he evidently failed. The most recent evidence of his engagement with child pornography dates to November 25, 2022, mere days before the arrest resulting in his instant conviction.

The conditions outlined in paragraphs 91 and 92 of the PSR are reasonably related to the immediate history and characteristics of the Defendant, the need to afford adequate deterrence, the

protection of the public from further crimes of the Defendant, and the provision of necessary correctional treatment. The Court should therefore impose them and overrule the Defendant's corresponding objection.

III.  *Application of the "Official Victim" Enhancement is Appropriate.*

The PSR rightly applied the "official victim" enhancement found at U.S.S.G. § 3A1.2(b). Citing Application Note 1 to the Guideline, the Defendant claims that the enhancement is inappropriate because the only victim of his conduct was an institutional organization. The proof at trial dictates that his objection should be overruled.

After discussing for months the best way to attack law enforcement, the Defendant developed and distributed a list of individual law enforcement officers to his cohort of would-be attackers. This, standing alone, permits the reasonable inference that the Defendant was targeting these individuals specifically. But the Court need not engage in such inferential analyses.

The uncontroverted proof at trial – including testimony by both Austin Carter and Christopher Roddy – established that this was a list of targets the Defendant intended to murder. Further, among many other things, Carter testified that the Defendant's ire was directed at both the FBI as an organization and against its agents and other law enforcement individually. The Defendant spoke frequently about killing FBI agents, thereby "taking out the eyes and ears of the enemy." The Defendant specifically targeted FBI Special Agent Jessi Mann, calling her "that bitch, Mann." Along with his kill list, the Defendant provided a video depicting specific law enforcement personnel including FBI Special Agent Richard Smith.

The Defendant's crimes were indeed directed at the FBI as an institution, but not *only* the institutional FBI. The Defendant stands convicted of conspiring to murder, soliciting violence against, and threatening to kill dozens of individual and identified law enforcement officers from the

8

Case 3:22-cr-00118-TAV-JEM   Document 125   Filed 06/13/25   Page 8 of 16
PageID #: 1074

FBI, Tennessee Bureau of Investigation, Tennessee Highway Patrol, Maryville Police Department, Blount County Sheriff's Office, and Clinton Police Department.

The Defendant's victims are federal, state, and local law enforcement officers. The Court should overrule his objection to the application of U.S.S.G. § 3A1.2(b).

IV. *Application of the Terrorism Enhancement is Appropriate.*

The Defendant committed felonies that involved and were intended to promote a federal crime of terrorism. The Court should apply U.S.S.G. § 3A1.4.

Upon the application of § 3A1.4, a defendant's Guidelines range should be increased by 12 levels or to level 32, whichever is greater. U.S.S.G. § 3A1.4(a). The application of the enhancement further results in a Criminal History Category of VI. *Id.* at § 3A1.4(b).

The application of U.S.S.G. § 3A1.4 is appropriate if the offense of conviction is "a felony that involved, or was intended to promote, a federal crime of terrorism." The Guidelines define "federal crime of terrorism" by way of reference to the definition provided in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4 cmt. n. 1.

Section 2332b(g)(5), in turn sets out two prerequisites for a "federal crime of terrorism": (1) an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) is one of a number of enumerated offenses, including an offense specifically identified as the object of the conspiracy charged in Count One of the indictment, 18 U.S.C. § 1114. In order for a sentencing court to apply a terrorism enhancement, the Court must find by a preponderance of the evidence that both of these requirements have been met. *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014).

The Sixth Circuit has read this Guideline to include a specific-intent requirement. *Id.* at 407-09. "A defendant has the requisite intent if he or she acted with the purpose of influencing or

9

affecting[3] government conduct and planned his or her actions with this objective in mind." *Id.* at 408. It is not necessary that influencing the government be the defendant's "ultimate or sole aim." *Wright*, 747 F.3d at 408.

The conditions for application of § 3A1.4 are met; the offenses of conviction involve or were intended to promote a federal crime of terrorism, specifically, the murder of federal employees. Section 2332b(g)(5) lists 18 U.S.C. § 1114 – addressing the murder of employees of the United States – as an enumerated offense. And in this case, the record is replete with evidence that the Defendant's conduct was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

Most directly, the Defendant's confederates testified to this fact with clarity. Both Carter and Roddy testified at length that the Defendant conspired to murder law enforcement precisely *because* he wished to keep them from performing their duties. He viewed them as enemies, and as above, he wanted to take out the "eyes and ears" of the government. Carter testified that he understood the Defendant was ready to kill FBI agents preemptively to hasten what he believed was an impending civil war. His efforts at violence were the foundations of a strategy specifically designed to affect government conduct by killing its front-line law enforcement officers.

The Defendant's actions were intended to retaliate against government conduct. Carter and Roddy testified about their conversations with the Defendant in this regard, including how his hostility toward the FBI grew more pronounced after his May 2022 arrest. The Defendant bore particular antipathy for those who participated in his arrest and the search of his house. Roddy specifically referred to the Defendant's desire to retaliate against "that bitch, Mann," for example.

---

[3] Or, per the statute, retaliating against.

10

Case 3:22-cr-00118-TAV-JEM    Document 125    Filed 06/13/25    Page 10 of 16
PageID #: 1076

The Defendant made a kill list of government personnel. Though he now takes great pains to note that it is captioned merely "the list," the uncontroverted proof at trial makes it clear that the list is of specific agents, officers, and other government employees against whom the Defendant wished to violently retaliate expressly on account of their performance of official duties. As Special Agent Mann testified, that group of 36 individuals has only two things in common: (1) they all participated in some official capacity in the search and arrest of the defendant, and (2) they are featured on the Defendant's kill list. That direct link, standing alone, is enough to establish the Defendant's retaliatory intentions.

Perhaps most notably, the Defendant's own words independently support the application of this enhancement. At trial, the Court heard the Defendant expressly dictate retaliatory attacks against the FBI:

> Here's our course of action . . . . If I'm extradited to D.C. or you don't hear about my status . . . if they are coming to arrest me . . . start it. You guys are taking out their office. What you and Austin need to do is recruit as many as you can. Call who you can, who you need to, and you're gonna attack their office. And if the same thing happens to any of you guys, I'm doing the same thing . . . . Every hit has to hurt. Every hit has to hurt.

(GX 9).

This call unequivocally evinces a clear retaliatory motive. He linked his call to attack the FBI with his or his cohort's arrest. Arresting criminals is a core governmental function performed only by law enforcement in the course of their official duties, and the Defendant explains that his planned attack was to be retribution for the performance of that duty. The Defendant was clear, and his words leave no room for doubt. His criminal conspiracy to murder law enforcement was deliberately calculated to influence, affect, and retaliate against government conduct. Thus, in this case, the Defendant's planned attack on law enforcement is a "federal crime of terrorism."

11

Still, for § 3A1.4 to apply, the offenses of conviction must either "involve" or be "intended to promote" such a terrorism crime. All three counts of conviction satisfy this prerequisite.

Count One – conspiracy to murder federal employees – is a crime "involving" a federal crime of terrorism. The Sixth Circuit has held that, in the context of § 3A1.4, the word "involved," "signifies that a defendant's offense included a federal crime of terrorism; in other words, that the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)." *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001). The Defendant conspired to commit an offense enumerated in § 2332b(g)(5) – i.e., 18 U.S.C. § 1114.[4] Accordingly, Count One is a crime that involved a federal crime of terrorism.

Separately, all three counts of conviction are crimes "intended to promote a federal crime of terrorism." When assessing whether a crime was "intended to promote" a crime of terrorism, the Court should impose the § 3A1.4 enhancement if it finds that the Defendant "intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime." *Graham*, 275 F.3d at 516. The offense of conviction itself need not be a "federal crime of terrorism." *Id.*

The Defendant's conspiracy, his solicitation to violence, and his threats were all intended to promote his plan to murder federal law enforcement in violation of 18 U.S.C. § 1114. Those attacks were object of the conspiracy in Count One, as found beyond a reasonable doubt by the jury. The Defendant's commands, inducements, and persuasions attempting to get Carter and Roddy to murder law enforcement and attack the FBI office constituted the solicitation to violence

---

[4] The Indictment charges that the Defendant and Carter "conspired . . . to murder officers and employees of the United States, to wit, employees of the Federal Bureau of Investigation, while such officers and employees were engaged in, and on account of the performance of, official duties, in violation of Title 18, United States Code, Section 1114." (Doc. 17 at 1).

contemplated in Count Two.  The threats that are the object of Count Three were serious expressions of intent to do harm: carrying out those assassinations and attacks.  Each count in the indictment necessarily – and elementally – is a felony "intended to promote" a federal crime of terrorism, and the application of § 3A1.4 is consequently appropriate as to each.

Because Count One is a felony involving a federal crime of terrorism and all three counts are felonies intended to promote a federal crime of terrorism, the Court should overrule the defendant's objection and calculate his Guidelines pursuant to the enhancement found at U.S.S.G. § 3A1.4.

V. *The Application of the Aggravating-Role Enhancement at U.S.S.G. § 3B1.1(c) is appropriate.*

The Defendant was an organizer and leader in connection with the charged conduct.  His Guidelines range is therefore appropriately enhanced pursuant to U.S.S.G. § 3B1.1(c).

The Guidelines commentary suggests a number of factors to consider when assessing this enhancement:

> exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1(c) cmt. n. 4.

Trial evidence establishes the Defendant's leadership in the charged crimes.  Carter and Roddy testified that the Defendant arranged drills, called for training, and hosted CQB exercises at his house.  He assigned roles to his comrades and prioritized victims for surveillance and targeting.  He made a plan to retrieve his weapons and ammo from his friend so that they would be at "arms' reach."  He called for a "course of action" and then, ultimately, devised that course.  (GX 9).  He created the kill list of his would-be victims.  (GX 2).  He distributed that list with instructions – along with thumb drives he made featuring Special Agent Smith's likeness – to Carter.  He told

13

Roddy that they should "recruit as many as they can" and attack the FBI. (GX 9). And, of course, he gave the final command needed to commence the attacks: "start it."

Given the level of the Defendant's participation, the direction he provided, the nature and scope of his crimes, the control he exerted, and the exercise of his decision-making authority – including the decision to commence the attacks on his arrest – the Court should overrule his objection and apply U.S.S.G. § 3B1.1(c).

> VI. The Defendant Manifested an Intent to Carry out his Threats, and the Court should apply U.S.S.G. § 2A6.1(b)(1).

In conjunction with Count Three (i.e., threatening to kill federal officials), if the "offense involved any conduct evidencing an intent to carry out such a threat," the Guidelines range is increased by six levels. U.S.S.G. § 2A6.1(b)(1). In assessing this specific offense characteristic, the Court should consider "both conduct that occurred prior to the offense and conduct that occurred during the offense," though conduct occurring before the instant offense must be "substantially and directly connected to the offense, under the facts of the case taken as a whole." *Id.* cmt. n. 1.

Each of the leadership steps the defendant took meriting the application of § 3B1.1 – making the kill list, distributing the kill list, directing the recruitment of accomplices, arranging a "hornet's nest" of weaponry, giving the go-ahead order to start the attacks – constitutes conduct evidencing his intent to carry out his threat. The Court could end its analysis there.

However, the Court may also look to other conduct to support this enhancement, as well. As Special Agent Smith testified, the Defendant obtained bomb-making components and a number of firearms. (GX 13). As Carter and Roddy testified, and as seen in the Signal chat excerpts, he trained for close-quarter combat. (GX 1). He had a "to do" and a "to buy" list with various weapons, armor, and survival gear, like flamethrowers, gas masks, and suppressors. (GX 14). He downloaded books purporting to demonstrate how to make explosives and poison bullets, among

14

many other things. (GX 23, 31). Carter explained to the jury that the Defendant planned for "offensive" attacks and precisely how those attacks would unfold.

The application of this Guideline provision is appropriate if the Defendant engaged in "any conduct" suggesting he was prepared to carry out his threat. He undertook several and varied deliberate actions demonstrating his intent. His objections should therefore be overruled.

VII. *The Defendant's Objection to Paragraph 62 Should be Sustained.*

The United States respectfully submits that the Court should sustain the Defendant's objection concerning the outcome of D.D.C. Case No. 1:22-cr-0408. (*See* Doc. 123 at 9; PSR at ¶ 62). He is correct that the Court found him not guilty of the second count in that indictment. *See United States v. Kelley*, D.D.C. Case No. 1:22-cr-0408, Doc. 84 at 39.

VIII. *The Defendant's Offense Level and Criminal History are Properly Calculated, and the Treatment Proposed in Paragraph 95(b) of the PSR is Appropriate.*

For the reasons stated herein, the Court should overrule the defendant's objections to PSR paragraphs 36, 43, 51, 53, 55, and 64. The Defendant's Guidelines range is properly calculated.

Further, the requirement that the Defendant participate in a program directed at addressing anger and violence is wholly appropriate. It is reasonably related to the dual goals of probation, the rehabilitation of the Defendant and the protection of the public. *See United States v. Ritter*, 118 F.3d 502, 504 (6th Cir. 1997).

Here, the Defendant engaged in a conspiracy to murder law enforcement, which is a crime of violence. *See In re Amawi*, 780 F. App'x 301, 306 (6th Cir. 2019) ("'[I]t cannot be seriously argued that murder is anything other than a crime of violence.'") (quoting *United States v. Darden*, 346 F. Supp. 3d 1096, 1133–34 (M.D. Tenn. 2018), collecting cases to that end). He solicited violence under circumstances strongly corroborative of his intent. He threatened violence and made a serious expression of an intent to harm police.

Given the violent and dangerous nature of the crimes for which the jury convicted the Defendant – along with the evidence presented at trial showing the Defendant's disposition toward violent and dangerous conduct – the imposition of the condition in Paragraph 95(b) of the PSR is well designed to protect the public and rehabilitate the Defendant.  It should be included as a component of the Court's sentence.

## CONCLUSION

The Court should sustain the Defendant's objection concerning the disposition of his litigation in Washington D.C.  It should also sustain his objection concerning the description of armaments found in a search of his residence.  The Court need not address a number of the background/biographical objections, as they do not affect his Guidelines range.

The Court should overrule the remainder of the Defendant's objections to his PSR, including each objection he has articulated bearing upon his advisory Guidelines range.  The United States Probation Office has correctly calculated that range, which the Court should adopt as the effective Guidelines range at sentencing.

Respectfully submitted,

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By:  */s/ Casey T. Arrowood*
*/s/ Kyle J. Wilson*
Casey T. Arrowood
Kyle J. Wilson
Assistant United States Attorneys
TN BPR No. 038225
TN BPR No. 031844
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 545-4167
Casey.Arrowood2@usdoj.gov
Kyle.Wilson@usdoj.gov