IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 3:22-cr-00118-TAV-JEM |
| | ) JUDGE VARLAN |
| EDWARD KELLEY, | ) Magistrate Judge McCook |
| | ) |
| Defendant. | ) |

### DEFENDANT EDWARD KELLEY'S MOTION FOR VARIANCE OR DEPARTURE AND SENTENCING MEMORANDUM

COMES the Defendant Edward Kelley ("Kelley"), by and through counsel and moves this Court for either a departure or variance from the sentencing guidelines. The recommended sentence in Kelly's Presentence Investigation Report ("PSR") is greater than necessary to achieve the purposes of 18 U.S.C. §3553(a).

Although Kelley has been convicted of serious offenses, no individual was directly threatened with harm or violence by Kelley, and no one was injured. Kelley does not deserve the same sentence as an actual "terrorist" who injured or killed hundreds or thousands of America citizens. The potential use of the terrorism enhancement under U.S.S.G. §3A1.4(a) to impose the maximum sentence allowed by Congress under one of the counts Kelley was convicted would not be just or reasonable under the facts and circumstances of this case. A variance or departure is the only way to ensure that Kelley is given a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of the sentencing statute.

In addition, as part of this Court's §3553(a) analysis, the Court should consider that Kelley has received a pardon for his conduct at the United States Capitol on January 6, 2021, which is the

underlying conduct resulting in this case. Secondly, Kelley honorably served his country as a member of the United States Marine Corps for eight years.

## INTRODUCTION

Kelley comes before this Court for sentencing after being convicted of Conspiracy to Murder Employees of the United States in violation of 18 U.S.C. §§1117 and 1114. (Count 1); Solicitation to Commit a Crime of Violence (Murder an Officer or Employee of the United States) in violation of 18 U.S.C. §§373 and 1114 (Count 2); and Threaten to Assault and Murder Federal Law Enforcement Officers with Intent to Impede, Intimidate, and Interfere with Federal Law Enforcement Officers While Engaged in the Performance of Official Duties, and with Intent to Retaliate against Such Federal Law Enforcement Officers on Account of the Performance of Official Duties in violation of 18 U.S.C. §§115(a)(1)(B) and 115(b)(4).

Kelley has filed objections to the PSR (Doc. No. 123 (sealed). Regardless of the Court's decision on his objections and the final guideline calculations, this case demands a departure or variance to a sentence well below the maximum authorized by Congress.

## LAW AND ARGUMENT

### I. 18 U.S.C. §3553(a)

The Federal Sentencing Guidelines were rendered advisory because of the United States Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005). This allows a sentencing judge to impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing in 18 U.S.C. §3553(a). *18 U.S.C. §3553(a) (West 2025)*.

In determining the appropriate sentence, a court considers (1) the nature and circumstances of the offense, and the history and characteristics of the defendant. *18 U.S.C. §3553(a)(1) (West 2025)*. The court also considers (2) the need for the sentence imposed to reflect the seriousness of

2

Case 3:22-cr-00118-TAV-JEM  Document 129  Filed 06/18/25  Page 2 of 15
PageID #: 1114

the offense, to promote respect for the law, and to provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  *18 U.S.C. §§3553(a)(2)(A), (B), (C), (D) (West 2025)*.

Further considerations include the kinds of sentences available; the kinds of sentence and sentencing range established for the applicable category of the offense committed by the defendant as set forth in the guidelines issued by the sentencing commission and in effect at the time of sentencing.  *18 U.S.C. §§3553(a)(3), (4)(A)(i), (ii) (West 2025)*.  Courts also consider any pertinent policy statements issued by the sentencing commission, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution for any victim.  *18 U.S.C. §§3553(a)(5), (6), (7) (West 2025)*.

The Federal Sentencing Guidelines Manual provides a roadmap for how a court proceeds in imposing a sentence.  A court should first calculate the applicable guideline, determine the base offense level, apply appropriate adjustments, repeat those steps in the event of multiple counts of conviction and apply the rules for multiple counting; apply an adjustment, if appropriate, for acceptance of responsibility; determine the defendant's criminal history category; determine the appropriate guidelines range; and then consider all options for probation, imprisonment, supervised release, fines and restitution.  *See, U.S.S.G. §1B1.1 (Application Instructions)*.

The sentencing guidelines range is the "starting point and initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 – 50, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007). The Court should give the parties an opportunity to argue for whatever sentence is appropriate and then consider the §3553(a) factors.  *Id*.  The Supreme Court has instructed sentencing judges to not presume the

3

guidelines range is reasonable and instead make an individualized assessment based on the facts presented. *Id*.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and punishment to ensue." *Rita v. United States*, 551 U.S. 338, 364, 124 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).

## II. THE SENTENCING ENHANCEMENT UNDER U.S.S.G. §3A1.4 SHOULD NOT APPLY

U.S.S.G. §3A1.4 provides –

(a) If the offense is a felony that involved, or was intended to promote a federal crime of terrorism, increase by 12 levels, but if the resulting offense level is less than Level 32, increase to Level 32.
(b) In each such case, the defendant's criminal history category for Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

*U.S.S.G. §3A1.4*

"Section 3A1.4 of the sentencing guidelines authorizes a 12-level enhancement for a felony that involved or was indented to promote a federal crime of terrorism." *United States v. Wright*, 747 F. 3d 399, 407 (6th Cir. 2014). "To define the phrase federal crime of terrorism, the guidelines provision directs [parties] to 18 U.S.C. §2332b(g)(5)." *Id*. "Section 2332b(g)(5) sets forth two requirements for an offense to be considered a federal crime of terrorism: first, the offense must be calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct and second, the underlying act must be included within an enumerated list of eligible offenses." *Id*.

"In order for the sentencing court to apply a terrorism enhancement, the government must show by a preponderance of the evidence that the two requirements of §2332b have been met. *See,*

*United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001)." *Id*.

There is no dispute that Kelley's conviction on Count 1 falls within the statute's enumerated offenses. The issue is intent and that's where the application of this enhancement fails. There is not enough evidence by any standard of proof that Kelley had a plan to attack the FBI field office in Knoxville. There were some discussions about that, and meetings between Kelley, co-defendant Austin Carter, and co-conspirator turned snitch Christopher Roddy but there was never a plan to intimidate, influence or retaliate against Government conduct. In fact, the only intent to retaliate came from the FBI and specifically special agent Joel Feaster whose activities in this case have been well documented in other filings to this Court.

The lack of a plan is best illustrated by the phone call between Roddy and Carter which was played during the trial. Roddy asked Carter if he was on board and Carter said he was if Roddy was and indicated he might take a different approach. Even the phone call where Kelley told Roddy that if he got caught up in the D.C. matter again to "start it" came with a caveat that Roddy and Carter would need others for any possible attack. Just talking about something is not a plan and without a plan there is no intent.

Applying the terrorism enhancement in this case would also render the §3553(a) superfluous and treat Kelley the same as individuals who are responsible for killing thousands of people and putting the security of United States citizens at risk. Kelley would face the same sentence as Oklahoma City Bomber Terry Nichols, serving 169 consecutive life sentences for his part in the 1995 bombing of the Murrah Federal Building in Oklahoma City. He would face the same sentence as Richard Reid, who tried to light a shoe bomb and bring down an aircraft, and the same sentence as Olympic Park Bomber Eric Rudolph.

5

The context of the reason the terrorism enhancement was added to the guidelines is also important. Congress directed the sentencing commission to add an enhancement after the 1993 bombing of the World Trade Center's North Tower in New York City. The enhancement treats those who do not cause actual harm the same as those who do. A defendant is no longer judged as an individual as the Supreme Court has instructed and instead is thrown into a one size fits all category.

Other Federal District Courts have recognized the difficulty in applying the terrorism enhancement to anyone whose offense just falls into the categories in the statute. In *United States v. Nayyar*, 2013 U.S. Dist. Lexis 79002 at *20 (S.D.N.Y. June 4, 2013), the Court observed:

> "[T]he 12-level enhancement in overall offense level is the result of a Congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies. See, U.S.S.G. App. C, Amend. 526. Second, the language of the enhancement is so broad as to encompass virtually every terrorism-related case, without distinguishing between those cases in which harm occurred and cases in which it did not."

\*\*\*

> "Application of the Terrorism Enhancement to the calculation of [the defendant's] offense level has the effect of obscuring the differences between [the defendant's] offense conduct, which did not result in any actual harm, and an instance where such conduct did result in actual harm. Such a distinction has been found to be a legitimate basis for imposing a lower sentence, even in a case involving terrorism offenses. See, *United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009)."

*Id*. at *21.

Should this Court decide the terrorism enhancement is appropriate, there are substantial grounds for a departure or variance to a sentence below the applicable guidelines range.

### III.  DEPARTURE VERSUS VARIANCE

This Court may either depart under the sentencing guidelines or vary from the applicable guidelines as part of its discretion.

6

"Departure is a term of art under the Guidelines and is distinct from a variance. A Guidelines departure refers to the imposition of a sentence outside the advisory range or assignment of a criminal history category different than the otherwise applicable category made to effect a sentence outside the range." *United States v. Thomas*, 395 Fed. Appx. 168, 175 fn. 4 (6th Cir. 2010). "Importantly a departure results from the district court's application of a particular guidelines provision, such as §4A1.3 or §5, Part K." *Id.* "A variance refers to the selection of a sentence outside the advisory Guidelines range based on the district court's weighing of one or more of the sentencing factors of §3553(a)." *Id.* "While the same facts and analyses can, at times, be used to justify both a guidelines departure and a variance, the concepts are distinct." *Id.*

"In general, a defendant who seeks a sentence below the calculated Guidelines range may ask for either a departure or variance." *United States v. Johnson*, 2023 U.S. App. Lexis 30405 at *2 (6th Cir. Nov. 14, 2023) (citing, *United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009). "The terms are distinct."

### A. GROUNDS FOR DEPARTURE

There are numerous grounds for departure in the Sentencing Guidelines. Supreme Court Justice Stevens in *Rita v. United States*, 551 U.S. 338, 364 – 365 (2007) wrote: "[t]he Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission Guidelines Manual §§5H1.1-6, 11 and 12 (Nov. 2006). These are, however, matters that §3553(a) authorizes the sentencing judge to consider. See, e.g., 18 U.S.C. §3553(a)(1)."

7

Case 3:22-cr-00118-TAV-JEM     Document 129     Filed 06/18/25     Page 7 of 15
PageID #: 1119

### 1. U.S.S.G. §4A1.3. Criminal History Inadequacy

U.S.S.G. §4A1.3 provides for both upward and downward departures from the Guidelines' range. The downward departure provision provides –

"(b) DOWNWARD DEPARTURES. –
(1) STANDARD FOR DOWNWARD DEPARTURE. – If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."

U.S.S.G. §4A1.3 (b)(1).

There are limitations on this departure that are not applicable to Kelley. Instead, Kelley has no criminal history. Probation has counted his conviction in Washington, D.C., for which he was pardoned as 1 point, but that only makes him a category I offender. But with the terrorism enhancement Kelley is vaulted into Category VI. There is no reasonable basis for treating him the same as an offender who has more than 13 criminal history points or a career offender with numerous drug crimes and crimes of violence in his background.

### 2. U.S.S.G. §5H1.11. Military, Civic, Charitable, or Public Service, Employment-Related Contributions; Record of Prior Good Works (Policy Statement).

"Military Service may be relevant in determining whether a departure is warranted, if the military service, individually, or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."

Kelley entered the Marine Corps on August 8, 2007, and was honorably discharged from service on August 27, 2015, for an active service period of 8 years and 15 days.[1] During that time in his capacity as a rifleman, Kelley was deployed to both Iraq and Afghanistan. Among his honors was the Combat Action Ribbon, Navy Unit Commendation, Navy Meritorious Unit

---

[1] A copy of Kelley's Certificate of Release or Discharge from Active Duty is filed under seal.

8

Commendation, Marine Corps Good Conduct Medal, National Defense Service Medal, Afghanistan Campaign Medal, and Global War on Terrorism Expedition Medal. He was trained in Helicopter Rope Suspension Techniques, Combat Hunter Training Course and Advanced Infantryman.

Kelley helped fight the Global War on Terrorism and now stands accused of being a terrorist. It's a label that doesn't fit.

### 3. U.S.S.G. §5K2.20: Aberrant Behavior (Policy Statement)

"(a) IN GENERAL. – Except where a defendant is convicted of an offense involving a minor victim under section 120, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code, a downward departure may be warranted in an exceptional case if (1) the defendant's criminal conduct meets the requirements of subsection (b); and (2) the departure is not prohibited under subsection (c).
(b) REQUIREMENTS. - The Court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or a single criminal transaction that (1) was committed without significant planning, (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law abiding life.
(c) PROHIBITIONS BASED ON THE PRESENCE OF CERTAIN CIRCUMSTANCES. – The Court may not depart downward pursuant to this policy statement if any of the following circumstances are present:
(1) The offense involved serious bodily injury or death;
(2) The defendant discharged a firearm or otherwise used a firearm or a dangerous weapon;
(3) The instant offense of conviction is a serious drug trafficking offense;
(4) The defendant has either of the following: (A) more than one criminal history point, as determined under Chapter Five (Criminal History and Criminal Likelihood) before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category); or (B) a prior federal or state felony conviction, or any other significant prior criminal behavior, regardless of whether the conviction or significant prior criminal behavior is countable under Chapter Four."

Kelley falls into criminal history category I. This offense involved little to no planning, was of a short duration and is a severe departure from what has been an otherwise law-abiding life.

9

### B. VARIANCE

Notwithstanding the grounds for departure, *Booker* gives this Court the discretion to vary from the sentencing guidelines. A guidelines sentence in this case is far too harsh considering the §3553(a) factors.

#### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

In this case, it is important to remember that no one suffered any injury, and no one was ever directly threatened with harm. Mr. Kelley engaged in a series of telephone calls with Carter and Roddy. Discussions did not lead to action. And while people may not like what Mr. Kelley had to say, he stands behind his position that he has a First Amendment right to free speech.

Mr. Kelley political convictions led him to Washington, D.C. on January 20, 2021. One can certainly debate whether the events of that day should have occurred, but Kelley is a thoughtful and intelligent person who served his country as a United States Marine for 8 years. His home life growing up wasn't the easiest as he often transferred to other schools and nearly watched his parents get divorced.

His father was often absent as he spent time in Africa serving as a doctor to provide medical relief. His mother's heart condition forced her into many days of hospitalization. She died in 2023 from heart and kidney failure while Kelley was in custody.

He has three siblings, two of whom are supportive of him. He has had no contact with his brother Michael who must distance himself from Kelley to protect his security clearance and his employment. He is in touch with his other brother.

His sister no longer speaks to him. She's a pediatric trauma surgeon in California and has different political beliefs. She even contacted the FBI to try and have him arrested while he was on pre-trial release for the Washington, D.C. January 6th case.

10

He was married before his now ex-wife filed for divorce in 2023. He is the father of two (2) sons, Henry age 7 and Lincoln age 3. His wife essentially turned her back on him when he was arrested and has not been supportive at all. His children are the other victims in this case, as they risk being without their father for a large portion of their lives.

Kelley does not have issues with substance abuse, or mental health. He has a solid work history not just as part of the military but also working in security and in heavy equipment operation. He is skilled as an infantry rifleman and trained in heavy equipment.

Kelley has done his part while in custody to help others. On two (2) occasions he assisted cell mates who were having a heart attack or suffering from seizures due to the lack of medication given from officials at the Blount County Jail. He's also led a prayer group at the jail to help others cope with their circumstances. Kelley does not fit the pattern of a terrorist.

### 3. Seriousness of the Offense, Respect for the Law, and Just Punishment

A below guidelines sentence would adequately meet these three sentencing factors. To punish Kelley in this same fashion and with the same sentence as a person who either killed or attempted to kill hundreds of people would in fact undermine respect for the law. "[I]t is not severe punishment that promotes respect for the law, it is appropriate punishment." *United States v. Olhovsky*, 562 F. 3d 530, 531 (3d Cir. 2009). "[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States,* 522 U.S. at 54.

No one is disputing that Kelley's offenses are serious, but when you think in terms of terrorism you think in terms of people who put their plans into action and not simply talk about a certain course of conduct.

Without the terrorism enhancement, and the other enhancements, Kelley still faces an Offense Level of 33 and a significant prison sentence. Level 33 is the correct offense level.

### 4. **Deterrence**

Kelley never had a criminal charge until he was arrested for actions at the United States Capitol on January 6, 2021. He has been held in pretrial custody since December 15, 2022, at the Blount County Jail and for a short period of time during the trial on his Washington, D.C. charges in the District of Columbia jail. There is no reason to impose a guidelines sentence as a deterrent. Kelley has lived a law-abiding life, and he only wants to serve a reasonable sentence and return to his family. The guidelines sentence is not reasonable. In addition, upon release he'll be subject to rigorous conditions of supervised release and won't enjoy complete freedom as soon as he is released.

His story has been well documented in both the local and national media. Any sentence imposed will be known to others who might be thinking about committing these types of offenses. A guidelines sentence is not necessary to solely send a message.

Custody and classification by the Bureau of Prisons is another factor in imposing a sentence in this case. The higher the sentence the harsher the conditions.

The case of *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415-NJR, 2021 U.S. Dist. LEXIS 245517 provides an excellent discussion of how the Bureau of Prisons classifies inmates:

> "Policies and procedures regarding an inmate's security level are found in BOP's Program Statement 5100.08. The Program Statement defines security levels as: Used to describe the structural variables and inmate-to-staff ratio provided at the various types of Bureau institutions (i.e., Minimum, Low, Medium, High). It also identifies the institution type required to house inmates based on their histories, institutional adjustment, and Public Safety Factors as well as the physical security of the institution to include mobile patrols, gun towers, perimeter barriers, housing, detection devices, inmate-to-staff ratio, and internal security. The BOP's five security levels are minimum, low, medium, high, and administrative…

…Inmates are classified based on the following factors: The level of security and supervision the inmate requires; the inmate's program needs, i.e. substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc. The Program Statement also lists additional factors when designating an inmate to a particular facility including but not limited to the following: the inmate's release residence; the level of overcrowding at a facility; any security, location or programming recommendation made by the sentencing court; any central inmate monitoring issues; any additional security measures to ensure the protection of victims/witnesses and the public in general; and any other factor(s) which may involve the inmate's confinement; the protection of society; and /or the safe and orderly management of a BOP facility…"

…One of the factors when determining an inmate's security point total is the severity of the current offense… Inmates with a current offense of making threatening communications receive the highest severity score…

…In addition to an inmate's security point score, BOP also applies public safety factors and management variables which could [affect] placement at either a higher or lower level [facility] than the specified point total indicates. For example, one of the public safety factors is threat to government officials [where the inmate] will be housed in at least a Low security level [facility], unless the PSF has been waived."

Kelley is likely to be sent to a high security or at best a minimum-security facility to serve his sentence due to the nature of these offenses. A Guidelines sentence almost assures that he will be held in maximum security. He's had no issues at the Blount County Jail but being branded a terrorist could very well expose him to one of the Bureau of Prisons dangerous maximum-security facilities, where survival is often the daily goal.

### 5. Other Considerations

The consideration of vocational or educational training, medical care and correctional treatment in the most effective manner do not seem to weigh in favor of a Guidelines sentence. Kelley will be able to take advantage of those programs regardless of his sentence. A Guidelines sentence will not provide much incentive for Kelley to try and participate in programs.

### 6. Sentencing Disparity

A significant downward variance should be granted in this case to avoid serious unwarranted sentencing disparity. First, Kelley directs this Court to Paragraph 107 of the Presentence Report. While the sample size is very small (only 4 defendants with an Offense Level and Criminal History Category the same as Kelley's), the average length of sentence was 357 months with a medium of 336 months. While less than the guidelines in this case, an average sentence is still significant.

The case of *United States v. Wright*, 747 F. 3d 399 (6th Cir. 2014) is an illustration of what a disparity a guidelines sentence in this case would be. In *Wright* the District Court for the Northern District of Ohio applied a terrorism enhancement to three (3) defendants who placed explosives at the base of a bridge in Ohio and attempted to detonate them. The plan failed as the explosives were "inert" and one of the alleged co-conspirators was an FBI informant.

The defendants were given sentences of 138 months (Guideline range calculated at 324-405), 117 months (Guideline range calculated 262 – 327 months), and 97 months (Guidelines range calculated at 188 – 235 months). Those were significant variances, and importantly in *Wright* the defendants took serious overt acts in placing explosives at the base of a bridge. Here we have a "list" that meant nothing without further action.

## CONCLUSION

Mr. Kelley respectfully requests that after considering the facts of this case, the grounds for departure or variance, and the 18 U.S.C. §3553(a) factors, this Court depart or vary from the Guidelines range to a sentence which will recognize the seriousness of the offense but also give him a chance for release.

Respectfully submitted this 18th day of June 2025

/s/ Mark E. Brown
Mark E. Brown (BPR #021851)
MENEFEE & BROWN, P.C.
2633 Kingston Pike, Ste. 100
Knoxville, Tennessee 37919
Phone: (865) 357-9800
Fax: (865) 357-9810
e-mail: mbrown@menefeebrown.com

*Attorney for the Defendant Edward Kelley*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June 2025 a true and exact copy of this document has been served via this Court's electronic filing system with service on all those appearing on this Court's electronic service certificate. All parties in interest may access this pleading via ECF.

/s/ Mark E. Brown
Mark E. Brown