UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD KELLEY | No. 3:22-CR-118<br><br>Judge Varlan |

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**MOTION FOR DEPARTURE AND VARIANCE**

Following his conviction for conspiring to murder federal employees, soliciting a crime of violence, and influencing federal officials by threat, the Defendant moves the Court to depart and vary from his Guidelines-recommended sentence. (Doc. 129). Any departure or variance would run counter to the statutory sentencing factors in 18 U.S.C. § 3553(a). The Court should deny the Defendant's motion and sentence him to a Guidelines sentence.

### I.    *The Sentencing Enhancement at U.S.S.G. § 3A1.4 Applies.*

The Defendant repeats several of the arguments that he made in his objections to the revised presentence investigation report ("PSR"). Initially, he argues that the sentencing enhancement under U.S.S.G. § 3A1.4 should not apply to him. (Doc. 129 at 4-6). The PSR correctly included the § 3A1.4 enhancement, and the United States incorporates by reference the arguments presented in its response to his objections. (Doc. 126).

The Defendant's offenses of conviction involved, or were intended to promote, a federal crime of terrorism. As described in the United States' previous filings, the Defendant's intent in committing the criminal offenses is clear: he intended to influence or affect the conduct of government by intimidation or coercion, and he intended to retaliate against government conduct.

The Defendant argues that the intent element in § 3A1.4 is not met because he did not have a plan to attack the FBI office.  In doing so, the Defendant ignores altogether his plan to assassinate specific, individual law enforcement personnel; dismisses the evidence presented at trial of his plan to attack the FBI office (and, among many other things, his direction to others to "start it"); and disregards the evidence establishing his unmistakable intent in carrying out his plan.

First, the Defendant devised a plan to assassinate law enforcement personnel.  The Defendant created a kill list of 36 individual federal, state, and local law enforcement personnel.  He printed the list and distributed it to Austin Carter and Christopher Roddy as their first "mission," along with a USB drive containing video files depicting the identified law enforcement personnel.  The evidence at trial established that Kelley's plan included identifying his victims' pattern of life and killing them at their offices, homes, or in public places.

Second, Kelley discussed his plans to attack the FBI office in Knoxville.  Carter testified that he and Kelley discussed these plans during an in-person meeting at Kelley's home in November 2022.  Carter further testified that the attack plan included the use of improvised explosive devices attached to drones and vehicles.  It was this part of the plan that Kelley initiated during a recorded call with Christopher Roddy on December 14, 2022.  In the event of his arrest, the Defendant instructed, "Start it.  You guys are taking out their office…. You don't have time to train or coordinate, but every hit has to hurt."

The focus of the § 3A1.4 analysis in this case is not whether the Defendant had a plan to murder employees of the United States (he did), but whether the Defendant possessed the requisite intent in committing the offenses of conviction.  The Defendant's intent is clear: he targeted law enforcement precisely because of its official function, including agents' and officers' roles in the

civil war he hoped to initiate and because of their participation in his May 2022 arrest and search of his home.

At trial, Carter testified that the Defendant evinced a desire to participate in – and even initiate – a civil war. He viewed the FBI as the enemy and, as such, were valid targets in the civil war because they served as the "eyes and ears" of the government.

Both Carter and Roddy testified about the Defendant's desire to retaliate against law enforcement for his May 2022 arrest. Not only did he express his desire to retaliate specifically against FBI Special Agent Jessi Mann, but the evidence at trial established that the Defendant created a list of 36 federal, state, and local law enforcement officers to be killed – all of whom were involved in either the arrest of the Defendant or the search of the Defendant's home in May 2022.

The Defendant's assertion that he had no plan to murder East Tennessee law enforcement is foreclosed by the jury verdict – the Defendant conspired to murder employees of the United States. Considering the evidence intrinsic to the offenses of conviction, the Defendant's intent to influence or affect the conduct of government and retaliate against government conduct is clear, and the enhancement at § 3A1.4 applies.

Although the application of § 3A1.4 to the Defendant's criminal offenses is straightforward, the Defendant argues that other courts have recognized the difficulty in applying § 3A1.4. No such difficulty exists here.

The *Nayyar* case – cited by the Defendant – is illustrative. *United States v. Nayyar*, 2013 WL 2436564 (S.D.N.Y. June 5, 2013). In *Nayyar*, the defendant was convicted of several offenses related to his provision of material support to a designated foreign terrorist organization, Hizballah. *Id*. at *1. In sum, the offense involved Nayyar selling a truck, a firearm, and ammunition to a confidential informant whom Nayyar believed was working for Hizballah. *Id*. at *3-5. At

3

sentencing, the court declined to impose the full measure of the § 3A1.4 enhancement because the defendant, as the United States conceded, was not "planning to blow anything up or commit any acts of violence." *Id*. at *8.

The United States makes no such concession in this case. The evidence presented at trial revealed that that the Defendant was planning to attack the FBI office in Knoxville with improvised explosive devices and was planning to assassinate the individual East Tennessee law enforcement personnel identified on his kill list. With respect to the application of § 3A1.4, the Defendant's offense conduct stands in stark contrast with the conduct under consideration in *Nayyar*.

The Defendant, in committing the offenses of conviction, acted with the purpose of influencing and affecting government conduct by intimidation or coercion, and retaliating against government conduct. The Court should apply the enhancement found at U.S.S.G. § 3A1.4.

## II. *Any Departure from the Guidelines Sentence is Unwarranted.*

The Defendant moves the Court to depart from his Guidelines-recommended sentence on three bases: U.S.S.G. §§ 4A1.3, 5H1.11, and 5K2.20. All three are unsupported.

Section 4A1.3 provides that when "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," the Court may depart accordingly. The Court should not do so here.

The Defendant's offense conduct fits squarely within the confines of U.S.S.G. § 3A1.4 and his post-conviction statements reveal a manifest lack of remorse. Even after a jury found him guilty of conspiring to murder employees of the United States, soliciting a crime of violence, and influencing a federal official by threat, the Defendant continues to justify his crimes. As described in the United States' Sentencing Memorandum, the Defendant's post-verdict recorded statements

4

exhibit his continued belief that he is a victim, the prosecution and jury verdict are unjust, and that his criminal conduct was compelled by his obligation as a "patriot."

Congress and the Sentencing Commission have concluded that the Defendant's crimes are serious, difficult to deter, and require a change in criminal history category. They have reasonably determined that crimes under the ambit of § 3A1.4 present a particularly grave threat because of the "dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal…." *United States v. Meskini*, 3119 F.3d 88, 92 (2d Cir. 2003). The Defendant's crimes are serious, he is remorseless, and he has demonstrated a desire to recidivate. A departure pursuant to § 4A1.3 is unwarranted.

Similarly, the Defendant's arguments concerning departures under U.S.S.G. §§ 5H1.11 and 5K2.20 are unavailing. As for § 5H1.11, the Defendant argues for a departure from the Guidelines-recommended sentence due to his 8 years of service in the Marine Corps. While the Defendant's military service is laudable, nothing in the record indicates his service rises to such an unusual degree warranting a departure. The Court can consider the Defendant's military service in assessing the Defendant's history and characteristics as part of its analysis under 18 U.S.C. § 3553, but the Defendant's service does not support a departure from the Guidelines-recommended sentence.

The Defendant's motion for an "aberrant behavior" departure pursuant to § 5K2.20 should also be denied. To qualify for a departure under § 5K2.20, the Defendant must have committed a single criminal occurrence or transaction that "(1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." *See* U.S.S.G. § 5K2.20(b). The Defendant fails all three.

The Defendant's crimes were the result of significant planning over several months. The evidence presented at trial showed the Defendant's plans began to take shape in October 2022. In

5

Case 3:22-cr-00118-TAV-JEM    Document 137    Filed 06/27/25    Page 5 of 11
PageID #: 1155

that month, the Defendant, Carter, and Christopher Roddy were part of the "Be Prepared" chat group where the Defendant discussed establishing rally points, meeting locations to conduct close quarters battle training ("CQB"), and immediate action drills. Thereafter, the Defendant and Carter conducted CQB training at the Defendant's home in November 2022 and the trio met at Jarvis Park in December 2022 where the Defendant discussed conducting assassination missions. The Defendant created and distributed a list of East Tennessee law enforcement personnel to kill, and he planned to retrieve his arsenal of weapons to store at Roddy's home so he could have them in "arms' reach." The Defendant's conduct was not "of limited duration." It spanned several months and involved significant planning.

Nor does the Defendant's conduct represent a deviation from an otherwise law-abiding life. As set forth in the United States' Sentencing Memorandum, the Defendant has for years accessed and viewed child pornography. Moreover, the Defendant has demonstrated a profound lack of remorse. While asking the Court for a departure based on his "aberrant behavior," he continues to believe that targeting East Tennessee law enforcement personnel for assassination was justified.

The Defendant's conduct in this case was not aberrant. It was the product of significant planning over several months. Accordingly, the Court should deny the Defendant's § 5K2.20 departure motion.

### III. *The Court Should Not Vary from the Guidelines-Recommended Sentence.*

The Defendant seeks a variance from the Guidelines-recommended sentence on several grounds, many of which are addressed in the United States' Sentencing Memorandum. (*See* Doc. 127). Two of the Defendant's arguments, while misplaced, merit further examination.

In considering the nature and circumstances of the offense, the Defendant asks this Court to vary downwards because no one suffered any injury. (Doc. 129 at p. 10). This assertion is profoundly incorrect.

As the Court is aware, several of the law enforcement personnel identified on the Defendant's list have provided statements to the Court. These statements describe in detail the impact of the Defendant's conduct – both acute and long-term. These statements detail the apprehension, anxiety, and fear for the safety of loved ones – including the fear of a first-time mother-to-be for the life of her unborn child – all caused by the Defendant's actions. Many of the victims describe how the Defendant's actions continue to impact them in the present: contemplations of their own execution in public places, suspicion at the sight of unknown vehicles in their neighborhoods, and withdrawal from relationships with loved ones.

The Defendant's actions not only injured the individuals identified on his kill list, but also their families – spouses, parents, and children. The statements provided by the victims provide numerous examples: fear for the safety of wives and husbands, fear for the safety of parents visiting from out of town, and a continued reluctance to allow children to play outside, all on account of the Defendant's actions. The injuries inflicted by the Defendant run deep and are long-lasting. His failure to recognize the impact of his conduct further underscores the need to impose a Guidelines sentence.

Moreover, the lack of physical injury provides no safe harbor for the Defendant. As Christopher Roddy testified at trial, in the early morning on December 13, 2022 – after having attended the meeting at Jarvis Park where the Defendant discussed conducting assassination missions, and a target list ten days prior – Roddy was handed an envelope containing the Defendant's kill list and the USB drive. Upon reading the list, Roddy decided to warn a friend of

7

his who was included on the list. Later that same day, Roddy met with law enforcement and told them about the list and the Defendant's plans to murder East Tennessee law enforcement. He also agreed to record calls with the Defendant and Carter. The list and USB drive provided to law enforcement by Roddy and the calls he recorded were all introduced as evidence in the Defendant's trial.

Roddy's decision to come forward and assist in the investigation of the Defendant enabled law enforcement to disrupt the Defendant's plan to assassinate East Tennessee law enforcement before anyone was physically injured. As Carter testified at trial, it was his belief that if he and the Defendant had not been arrested, individuals included on the Defendant's kill list would have been murdered. This testimony combined with the Defendant's instruction to "start it" on the day before his arrest, underscore the significance of Roddy's actions in mid-December 2022.

While Roddy's actions led to the disruption of the Defendant's planned assassinations without any physical harm, it is the Defendant who seeks relief from the Court in the form of a variance. Contrary to the Defendant's request, the Court should not credit the Defendant for the actions of Roddy. A variance below the Guidelines-recommended sentence on this basis is unwarranted.

Finally, a Guidelines sentence will not create an "unwarranted sentence disparity." 18 U.S.C. § 3553(a)(6). The statutory sentencing schematic states that, when fashioning its sentence, the Court should consider the need to avoid such unwarranted disparities among similarly situated defendants. *Id.* This consideration is embraced by the Sentencing Guidelines, which are "almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Simmons*, 501 F.3d 620, 626 (6th Cir. 2007) (internal quotation omitted); *see also Gall v. United States*, 552 U.S. 38, 54 (2007) ("As with the seriousness of the offense conduct,

8

avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").

Avoidance of unwarranted disparities was "clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall*, 552 U.S. at 54. "[T]he point of the guidelines is to decrease sentencing disparities, an objective *furthered* by a within-guidelines sentence, as opposed to a sentence that varies above or below the advisory guidelines range." *United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011) (emphasis in original).

The Guidelines should be "treated as a major and persuasive factor among the universe of considerations contemplated by § 3553(a)." *United States v. Phelps*, 366 F. Supp. 2d 580, 589 (E.D. Tenn. 2005). Though the Court must exercise its own independent judgment as to a sentence that will satisfy 18 U.S.C. § 3553, the Guidelines are the result of a "democratic and deliberative process designed to give tangible expression to the nation's collective penal philosophy, taking into account the assorted broad principles and ideals underlying criminal sentence." *Id.* Here, the Guidelines have functioned accordingly, and the sentence they prescribe is sufficient but not greater than necessary to meet the objectives of § 3553(a).

In the face of this backdrop, the Defendant identifies *United States v. Wright*, 747 F.3d 399 (6th Cir. 2014) to convince the Court that a Guidelines sentence would create an unwarranted sentencing disparity. Upon a closer review, however, *Wright* does just the opposite.

The Defendant is correct in that the *Wright* defendants were convicted of offenses related to their efforts to destroy a bridge with explosives and were sentenced by the court to prison terms significantly below the sentencing ranges recommended by the Guidelines – Wright, the most culpable defendant, receiving a sentence of 138 months in prison. *Wright*, 747 F.3d at 404-07.

However, the circumstances present in *Wright* are readily distinguishable from those present here in ways that are material to the Court's sentencing analysis.

First, the defendants in *Wright* expressed remorse for their conduct and accepted responsibility for their actions by pleading guilty. *Id.* at 406. Conversely, the Defendant here does not appreciate the severity of his actions, has not accepted responsibility for his conduct, and is remorseless.

Second, the adjusted offense levels under the Guidelines for Wright – the most culpable defendant in that case – and for the Defendant are significantly dissimilar. As the District Court found in *Wright*, the defendant's adjusted offense level, after applying the § 3A1.4 enhancement, was 36. *Id.* Recognizing the heightened severity of the Defendant's crimes, the Sentencing Guidelines provide an offense level of 55, twelve levels higher than the highest level depicted on the Sentencing Table.

| 36 | 188–235 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 |
| 37 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life |
| 38 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life | 360–life |
| 39 | 262–327 | 292–365 | 324–405 | 360–life | 360–life | 360–life |
| 40 | 292–365 | 324–405 | 360–life | 360–life | 360–life | 360–life |
| 41 | 324–405 | 360–life | 360–life | 360–life | 360–life | 360–life |
| 42 | 360–life | 360–life | 360–life | 360–life | 360–life | 360–life |
| 43 | life | life | life | life | life | life |

Guidelines Manual (November 1, 2024) ║ 417

Third, the reasons for the variance given to Wright are not applicable here. The District Court varied downwards in sentencing Wright for three reasons: the inert C-4 explosives provided to Wright were not capable of causing any damage, a confidential human source facilitated Wright's crimes in considerable measure, and Wright's childhood led to substance abuse issues. *United States v. Wright*, 1:12-CR-238, Doc. 205-1 at pp. 11, 12 (N.D. Ohio Nov. 21, 2012). Here, the Defendant's planned attack on East Tennessee law enforcement could have caused significant loss

of life, no one working on law enforcement's behest facilitated the Defendant's conduct, and the Defendant does not have a history of substance abuse.

Even if the Defendant received the same downward variance as Wright (which he should not), the Guidelines-recommended sentence would not change. By sentencing Wright to 138 months in prison, the District Court varied by no more than ten offense levels. Reducing the Defendant's offense level by ten, results in an adjusted offense level of 45, still two levels more than the highest level on the Sentencing Table and still corresponding to a Guidelines-recommended sentence of life in prison.

A Guidelines sentence accurately captures the seriousness of the Defendant's criminal offenses and will not create an unwarranted sentencing disparity. The Defendant's request for a variance on this basis should be denied.

## CONCLUSION

The Defendant's motion for departure and variance from the applicable Guidelines sentence should be denied. Each of the relevant sentencing considerations points to the same conclusion: the Court should sentence the Defendant to the Guidelines-recommended sentence of life in prison.

Respectfully submitted,

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By: */s/ Casey T. Arrowood*
*/s/ Kyle J. Wilson*
Casey T. Arrowood
Kyle J. Wilson
Assistant United States Attorneys
TN BPR No. 038225
TN BPR No. 031844
800 Market Street, Suite 211
Knoxville, TN 37902, (865) 545-4167
Casey.Arrowood2@usdoj.gov
Kyle.Wilson@usdoj.gov